# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
Case No.: 3:23-CV-00894-RJC-SCR

**Clean Juice Franchising, LLC,**

        Plaintiff,

v.

**Charleston Juicing, LLC,**
**Charleston Juicing Calhoun, LLC,**
**Charleston Juicing West Ashley, LLC,**
**Charleston Juicing Mt. Pleasant, LLC,**
**Roy O. Crain,**
**CJ Collegeville, LLC,**
**CJ Malvern, LLC,**
**CJ Wynnewood, LLC,**
**Vogt Goodyear Enterprises, LLC,**
**Debra K. Manchester,**
**Morgan K. Manchester, &**
**Richard Kline,**

        Defendants.

**<u>BRIEF IN SUPPORT OF</u>**
**<u>CLEAN JUICE'S</u>**
**<u>MOTION FOR</u>**
**<u>PRELIMINARY INJUNCTION</u>**

January 17, 2024

**BRADLEY ARANT BOULT CUMMINGS LLP**

*/s/ Matthew S. DeAntonio*
Matthew S. DeAntonio (N.C. Bar No. 39625)
214 North Tryon Street, Suite 3700
Charlotte, North Carolina 28202
Telephone: (704) 388-6000
Facsimile: (704) 332-8858
mdeantonio@bradley.com

*Attorneys for Plaintiff*
*Clean Juice Franchising, LLC*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................iii

INTRODUCTION .............................................................................................................. 1

FACTS ............................................................................................................................ 2

    A.    Clean Juice's franchise enterprise and proprietary business method.................... 2

    B.    Defendants enter into franchise agreements for five juice bar restaurants. .......... 2

    C.    Clean Juice provides Defendants with its proprietary business method and training. ...................................................................................................... 4

    D.    Defendants promise to pay for the System, keep it confidential, and not compete with Clean Juice. ................................................................... 5

    E.    Defendants' open a competing juice bar, CraveWell Café, using Clean Juice's proprietary methods. ................................................................... 6

    F.    Clean Juice terminates the franchise agreements, but the franchisees refuse to comply with their post-termination obligations................................ 8

    G.    Procedural History ........................................................................................ 9

ARGUMENT .................................................................................................................. 10

I.    Clean Juice provided sufficient notice.......................................................................... 10

II.    Clean Juice satisfies the substantive legal standard for a preliminary injunction............ 11

    A.    Clean Juice is likely to succeed on the merits.................................................... 11

        1.    Defendants breached the franchise agreements and Guaranties. ............. 11

            a.    Clean Juice properly terminated the franchise agreements, thus triggering the franchisees' and guarantors' post-termination obligations. .............................................................. 11

            b.    Defendants breached their post-termination obligations. ............ 13

            c.    The guarantors breached their Guaranties. ................................. 18

        2.    Defendants misappropriated Clean Juice's trade secrets. ........................ 19

            a.    Clean Juice possesses trade secrets............................................ 20

i

          b.      Defendants misappropriated Clean Juice's trade secrets. ............ 21

B.     Clean Juice will suffer irreparable harm without an injunction. .......................... 22

C.     The balance of equities tips in Clean Juice's favor ............................................... 24

D.     An injunction is in the public interest. .................................................................. 25

CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*3M Co. v. Christian Investments LLC*,
 1:11-CV-627, 2011 WL 3678144 (E.D. Va. Aug. 19, 2011) ................................10

*Am. Dairy Queen Corp. v. YS & J Enters., Inc.*,
 No. 5:14-CV-151-BR, 2014 WL 1327017 (E.D.N.C. Apr. 2, 2014)....................24

*Amerigas Propane, L.P. v. Coffey*,
 No. 14-CVS-376, 2015 WL 6093207 (N.C. Super. Oct. 15, 2015)........................19

*Barr-Mullin, Inc. v. Browning*,
 108 N.C. App. 590, 424 S.E.2d 226 (1993)...........................................................23

*Baskin-Robbins Inc. v. Golde*,
 No. 5:99-CV-102-BR(3), 2000 WL 35536665 (E.D.N.C. May 26, 2000)........14–15

*Beasley v. Banks*,
 90 N.C. App. 458, 368 S.E.2d 885 (1988)..............................................................14

*Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*,
 368 N.C. 693, 784 S.E.2d 457 (2016).....................................................................16

*Carlson Env't Consultants, PC v. Slayton*,
 No. 3:17-CV-00149-FDW-DCK, 2017 WL 4225993 (W.D.N.C. Sept. 21,
 2017) ......................................................................................................................18

*Deutchland Enterprises, Ltd. v. Burger King Corp.*,
 957 F.2d 449 (7th Cir. 1992) ...........................................................................12–13

*Di Biase v. SPX Corp.*,
 872 F.3d 224 (4th Cir. 2017) .................................................................................11

*Duct-O-Wire Co. v. U.S. Crane, Inc.*,
 31 F.3d 506 (7th Cir. 1994) ...................................................................................23

*Dunkin' Donuts, Inc. v. Array Donuts, L.L.C.*,
 No. CV-05-387(JWB), 2005 WL 8176239 (D.N.J. Apr. 13, 2005) ......................21

*Farr Assocs., Inc. v. Baskin*,
 138 N.C. App. 276, 530 S.E.2d 878 (2000)............................................................16

*Forrest Paschall Mach. Co. v. Milholen*,
 27 N.C. App. 678, 220 S.E.2d 190 (1975)..............................................................17

iii

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty.*,
415 U.S. 423 (1974) ..................................................................................................... 10

*Handel's Enterprises, Inc. v. Schulenburg*,
765 F. App'x 117 (6th Cir. 2019) ................................................................................ 20

*Hunter Structural, P.A. v. Arp Eng., Inc.*,
No. 3:17-CV-00086, 2018 WL 662367 (W.D.N.C. Feb. 1, 2018) ........................... 19

*Jewel Box Stores Corp. v. Morrow*,
272 N.C. 659, 158 S.E.2d 840 (1968) ....................................................................... 16

*Keating v. Baskin-Robbins USA Co.*,
No. 5:99–CV–148–BR(3), 2001 WL 407017 (E.D.N.C. Mar. 27, 2001) ................. 13

*Keith v. Day*,
81 N.C. App. 185, 343 S.E.2d 562 (1986) ................................................................. 16

*Lockhart v. Home-Grown Indus. of Ga., Inc.*,
No. 3:07-CV-297, 2007 WL 2688551 (W.D.N.C. Sept. 10, 2007) ................... *passim*

*Maaco Franchisor SPV, LLC v. Sadwick*,
No. 3:20-CV-147, 2020 WL 2310730 (W.D.N.C. May 8, 2020) ........................ 15, 22–23

*Manpower of Guilford Cnty., Inc. v. Hedgecock*,
42 N.C. App. 515, 257 S.E.2d 109 (1979) ................................................................. 17

*Med. Search Consultants LLC v. Pasture Gate Holdings, Inc.*,
No. 1:23-CV-00118-MR-WCM, 2023 WL 3396902 (W.D.N.C. May 10, 2023) ........................................................................................................................... 20

*Med. Staffing Network, Inc. v. Ridgway*,
194 N.C. App. 649, 670 S.E.2d 321 (2009) ............................................................... 22

*Meineke Car Care Centers, Inc. v. Bica*,
No. 3:11-CV-369-FDW-DCK, 2011 WL 4829420 (W.D.N.C. Oct. 12, 2011) .......... 14, 22–23

*Meineke Car Care Centers, Inc. v. Quinones*,
No. 3:06-CV-87-MU, 2006 WL 1549708 (W.D.N.C. June 1, 2006) ........................ 22

*Meineke Car Care Centers, LLC v. ASAR Inc.*,
No. 3:14-CV-129-RJC, 2014 WL 3952491 (W.D.N.C. Aug. 13, 2014) ............... 13–14

*Merck & Co. Inc. v. Lyon*,
941 F. Supp. 1443 (M.D.N.C. 1996) .......................................................................... 25

iv

*Outdoor Lighting Persps. Franchising, Inc. v. Home Amenities, Inc.*,
    No. 3:11-CV-0567-GCM, 2012 WL 137808 (W.D.N.C. Jan. 18, 2012) .........................14–15

*Poor v. Hill*,
    138 N.C. App. 19, 530 S.E.2d 838 (2000) ...............................................................................11

*Quizno's Corp. v. Kampendahl*,
    No. 01-C-6433, 2002 WL 1012997 (N.D. Ill. May 20, 2002)........................................20–21

*Robins & Weill, Inc. v. Mason*,
    70 N.C. App. 537, 320 S.E.2d 693 (1984).....................................................................16–17

*Sineath v. Katzis*,
    218 N.C. 740, 12 S.E.2d 671 (1940).......................................................................................16

*Sunbelt Rentals, Inc. v. Head & Engquist Equip., LLC*,
    No. 00-CVS-10358, 2003 WL 21017456 (N.C. Super. Ct. May 2, 2003) .............................21

**Statutes**

18 U.S.C. § 1836.............................................................................................................................19

18 U.S.C. § 1839.......................................................................................................................20–21

N.C. Gen. Stat. § 66–152.......................................................................................................19–21

N.C. Gen. Stat. § 66–154...............................................................................................................19

N.C. Gen. Stat. § 66-155...............................................................................................................21

**Other Authorities**

Fed. R. Civ. P. 65...........................................................................................................................10

www.cravewellcafe.com.............................................................................................................7, 8

# INTRODUCTION

In a successful franchise relationship, the franchisor provides the franchisee with a proprietary business method—a proven concept, a tried-and-true way of doing business—in addition to its trademarks and goodwill. This gives the franchisee a leg up on the competition. It need not reinvent the wheel. The franchisor builds a consistent, national identity, which in turn benefits all the franchisees in the system. Not surprisingly, the franchisor only shares its proprietary business method in return for a binding promise that the franchisee will safeguard this information and use it only for the franchised business.

The Defendants in this case betrayed that fundamental bargain. After operating five franchised Clean Juice restaurants for several years—with full access to Clean Juice's proprietary business method—Defendants abruptly shut down their Clean Juice restaurants and stopped paying royalties. Within days they reopened as a competing business, CraveWell Café, at the exact same locations. CraveWell Café is a near carbon copy of Clean Juice. At bottom, the Defendants stole Clean Juice's proprietary business method, which they are now using to compete with Clean Juice rather than for the benefit of the franchise system.

Defendants' conduct is antithetical to the franchise model. It is also prohibited by Defendants' franchise agreements, their personal guaranties, and federal and state trade secrets law, which is why Courts routinely enjoin franchisees who engage in similar conduct. *See, e.g.*, *Lockhart v. Home-Grown Indus. of Ga., Inc.*, No. 3:07-CV-297, 2007 WL 2688551, at *1 (W.D.N.C. Sept. 10, 2007) (enjoining ex-franchisees who opened "Moondog's Pizza Pubs" at the same locations of their former Mellow Mushroom franchises). Through this Motion, Clean Juice seeks a preliminary injunction to prevent Defendants from operating CraveWell Café in a way that violates their contractual obligations and causes more irreparable harm to Clean Juice and its franchise system.

## FACTS

### A.    Clean Juice's franchise enterprise and proprietary business method.

Clean Juice Franchising, LLC ("Clean Juice") franchises organic juice bar restaurants. (Compl. ¶ 24). Since the first restaurant opened in 2015 through the end of 2022, the chain grew to 134 affiliate-owned and franchised locations in 27 states. (*Id.* ¶¶ 26–27). Clean Juice restaurants sell smoothies, fresh juices, cold-pressed juices, wellness shots, cleanses, acai bowls, salads, sandwiches and wraps, and toasts. (Dkt. 7 ¶ 32–34; Dkts. 7-20, 7-21).

Over time, Clean Juice developed a proprietary business method for operating a juice bar (the "System"). (Franchise Agreements § 1.2; Dkt. 7 ¶¶ 3–8). The System is codified in Clean Juice's 213-page Operations Manual (the "Manual"), which sets forth the "proprietary recipes and processes that are unique to Clean Juice stores" and serves as a "'go-to' resource for all operational aspects of [a franchisee's] business." (Franchise Agreements § 1.11; Dkt. 7 ¶ 8; Dkt. 7-1 at 14, 18).[1] Among other topics, the Manual includes methods for site selection, signage, trade dress, trademarks, equipment, inventory management, cost control, recipes, food preparation, health and safety compliance, advertising, and promotion. (Dkt. 7-1 at 3–13).

### B.    Defendants enter into franchise agreements for five juice bar restaurants.

In 2017, Charleston Juicing, LLC, wholly owned by Roy Crain, entered into franchise agreements for two franchised Clean Juice restaurants in Charleston, South Carolina:[2]

---

[1]    All pinpoint citations are to the page numbers on the automatically generated ECF footer, and not to any native pagination.

[2]    Charleston Juicing, LLC signed a third franchise agreement to open a restaurant in West Ashley, Charleston, South Carolina (Dkt. 1-2). That agreement is not pertinent to this motion.

| Table 1 | | | |
|---|---|---|---|
| **Approved Location** | **Effective Date** | **Franchisee Entity** | **Cite** |
| 696 Johnnie Dodds Blvd., Ste. 101, Mt. Pleasant, SC 29464 | January 5, 2017 | Charleston Juicing, LLC | Dkt. 1-1, at 62 |
| 168 Calhoun St., Charleston, SC 29401 | December 23, 2017 | Charleston Juicing, LLC | Dkt. 1-3, at 62 |

The agreements had 10-year terms and required the franchisees to operate from the "Approved Locations" specified above. (Dkts. 1-1, 1-3 §§ 2.2, 4.1 & Attach. A). In accompanying Owner's Guaranty and Restriction Agreements ("Guaranties"), Crain personally guaranteed the payment and performance of each franchise agreement. (*Id.* Attach. C).

In 2019, entities wholly owned by Debra and Morgan Manchester entered into franchise agreements to open three franchised Clean Juice restaurants in the Philadelphia suburbs:

| Table 2 | | | |
|---|---|---|---|
| **Approved Location** | **Effective Date** | **Franchisee Entity** | **Cite** |
| 121 Market Street, Ste. F6-A, Collegeville, PA 19426 | July 6, 2019 | CJ Collegeville, LLC | Dkt. 1-5; Dkt. 7-3 |
| 20 Liberty Blvd., Suite 170, Malvern, PA 19355 | July 6, 2019 | CJ Malvern, LLC | Dkt. 1-6; Dkt. 7-4 |
| 50 E. Wynnewood Rd., Store #9, Wynnewood, PA 19096 | July 6, 2019 | CJ Wynnewood, LLC | Dkt. 1-7, at 54 |

These agreements also had 10-year terms and required the franchisees to operate from these Approved Locations.[3] (Dkts. 1-5 to 1-7 §§ 2.2, 4.1 & Attach. A). The Manchesters signed Guaranties personally guaranteeing payment and performance of each franchise agreement. (*Id.* Attach. C §§ 4.1, 4.2).

---

[3]    When the parties signed the Collegeville and Malvern franchise agreements, the franchisees had not yet secured an Approved Locations for those restaurants. (Dkt. 7 ¶¶ 11–13; Dkts. 7-3, 7-4). Subsequently, Clean Juice approved the Approved Locations in this chart, and the Manchesters operated from these Approved Locations for their entire time as franchisees. (*Id.*).

### C.  Clean Juice provides Defendants with its proprietary business method and training.

Through the franchise agreements, Clean Juice licensed the System to the Charleston and Philadelphia franchisees and, to ensure consistency, required that they implement it with "strict conformity." (Franchise Agreements §§ 2.1, 8.3). Pursuant to Section 6.3 of each franchise agreement, Clean Juice provided the Manual to the franchisees through a password-protected website. (Dkt. 7 ¶ 20; Dkt. 7-7 at 4). As typical in franchise relationships, Clean Juice also provided the franchisees with a license to use its federally registered trademarks. (Franchise Agreements § 10.1.3).

Clean Juice taught the Charleston and Philadelphia franchisees how to operate a juice bar, as neither Crain nor the Manchesters had any prior experience operating a restaurant.[4] (Dkt. 7 ¶¶ 14–15). Clean Juice hosted eight Philadelphia employees (including the Manchesters) and three Charleston employees for Clean Juice University, which is a multi-day course that teaches franchise owners and managers how to implement the System. (*Id.* ¶¶ 16–19; Dkt. 7-6). Clean Juice's online resources portal provided the franchisees with access to a vast library of training materials. (Dkt. 7 ¶ 21; Dkt. 7-7). Clean Juice paid the salary of a Field Business Consultant who visited the franchisees' stores and provided operational feedback. (Dkt. 7 ¶ 22; Dkts. 7-8, 7-9). Clean Juice implemented a mystery shopper program, under which undercover shoppers visited the franchisees' restaurants and shared feedback about their guest experience. (Dkt. 7 ¶ 23; Dkts. 7-10, 7-11).

After receiving the Manual and completing training, the Charleston and Philadelphia franchisees used the Clean Juice System to operate their restaurants. Indeed, regular brand audits

---

[4]  Crain is a real estate broker. (Dkts. 6-1, 6-2). Debra Manchester worked in property management. (Dkt. 6-3). Morgan Manchester's background is financial sales. (Dkt. 6-4).

found the franchisees had implemented and generally complied with the System. (Dkt. 7 ¶¶ 24–27; Dkts. 7-12 to 7-14).

Clean Juice has analyzed the geographic scope of the franchisees' customer base. While Clean Juice does not collect the home addresses of its customers, it does collect phone numbers. Using customers' area codes as a rough proxy for their locations, Clean Juice's analysis indicates each store drew customers from outside a 10-mile radius. (Dkt. 7 ¶¶ 28–31; Dkts. 7-15 to 7-19).

### D. Defendants promise to pay for the System, keep it confidential, and not compete with Clean Juice.

In exchange for the System, the franchisees agreed to pay Clean Juice money. Each franchisee paid a one-time initial franchise fee ranging from $30,000 to $42,500 per location. (Franchise Agreements § 5.1). The franchisees also paid continuing royalties calculated as a percentage of Gross Sales. (Dkts. 1-1, 1-3 § 5.2; Dkts. 1-5 to 1-7 § 5.3). Of course, after opening for business, the franchisees were required to "***keep*** [their Franchised] Business open." (Franchise Agreements § 8.2 (emphasis added)).

The franchisees also promised to keep the System "confidential" and to "use all reasonable efforts to maintain such information as secret and confidential." (*Id.* § 11.1). They could use the System "***only*** for [their] Franchised Business and to perform under this Agreement." (*Id.* § 11.3 (emphasis added)). Upon termination, the franchisees had to "immediately and permanently cease to use . . . any confidential methods, procedures, and techniques associated with the System." (*Id.* § 17.2). They were required to return, delete, or destroy all copies of the Manual and any other confidential information. (*Id.* §§ 11.3, 17.8).

As additional protection, Clean Juice required the franchisees to obtain confidentiality agreements from any employee to whom the System was disclosed. (*Id.* § 11.5). Nobody could access the Manual or the resources portal without a password. (Dkt. 7 ¶ 20–21). Clean Juice

marked each page of the Manual as "Proprietary and confidential information." (Dkt. 7-1).

After acknowledging that they would "receive valuable specialized training and confidential information," the franchisees agreed not to compete with Clean Juice during the term of the franchise agreements:

> You covenant that during the term of this Franchise Agreement you will not, either directly or indirectly, except as otherwise approved in writing by us, for yourself, or through, on behalf of, or in conjunction with, any person, persons, or legal entity, directly or indirectly (including through an act of omission), divert or attempt to divert any business or customer of your Business to any competitor by inducement or otherwise . . . .

(Franchise Agreements § 18.2 (the "In-Term Covenant")). The franchisees also agreed to a post-termination noncompetition covenant. Specifically, for two years after termination of the franchise agreements, they could not:

> either directly or indirectly, for yourself, or through, on behalf of, or in conjunction with any person, persons, or legal entity (including legal entities which own, are owned by, or are under common ownership with you), own, maintain, advise, operate, engage in, lease to, be employed by, make loans to, or have any interest in or relationship or association with a business which offers the same or similar products or services as those offered by your Business or the System, and which is located (i) at the Approved Location, (ii) within ten miles of the Approved Location, or (iii) within ten miles of any Clean Juice Store open or under construction on the Effective Date of this Franchise Agreement.

(*Id.* § 18.3 (the "Post-Term Covenant")).

In the Guaranties, Crain and the Manchesters agreed to personally comply with the confidentiality provisions and In-Term and Post-Term Covenants. (*Id.* Attach. C §§ 1.3, 2.1, 3.1).

**E.  Defendants' open a competing juice bar, CraveWell Café, using Clean Juice's proprietary methods.**

On August 30, 2023, the Manchesters informed Clean Juice that the Collegeville, Malvern, and Wynnewood restaurants "will be closing in September" and "rebranding," although they did not describe the nature of the new restaurant. (Dkt. 7-25). When the restaurants permanently closed

on September 23, 2023, Clean Juice informed the Manchesters that the closures were not approved. (Dkts. 7-26 to 7-28). On October 2, a restaurant named "CraveWell Café" posted on Instagram that it had opened three restaurants at the exact same Approved Locations where the Manchesters previously operated their Clean Juice restaurants. (*Compare* Dkts. 6-9 to 6-11 at 2, *with* Table 2, *supra* at 3). The Manchesters own and operate these restaurants. (Dkts. 6-6, 6-7).

On November 13, 2023, the Charleston franchisees' general manager, Richard Kline, informed Clean Juice that the downtown and Mt. Pleasant Clean Juice locations "will be closing our doors on November 21st at 3pm est," but he did not reference any new restaurant concept. (Dkt. 7-29). At least as early as December 2, 2023, two CraveWell Café restaurants began operating out of the Charleston franchisees' Approved Locations. (*Compare* Dkt. 9 ¶¶ 6–16, *and* Dkt. 9-1, *with* Table 1, *supra* at 3).

In retrospect, the evidence suggests the Charleston and Philadelphia franchisees had been secretly collaborating on this new venture while still operating their Clean Juice restaurants. Despite being hundreds of miles away from each other, both franchisee groups have employed Richard Kline since at least March 2023. (Dkt. 7-31). Additionally, on September 16, 2023—before CraveWell Café had opened in either market—one of the Charleston franchisees' managers, Bill Rosene, sought access to a confidential Clean Juice document from the email address, "bill.rosene@***cravewellcafe.com.***" (Dkts. 7 ¶¶ 39, 7-23, 7-30 (emphasis added)). This document was a guide for preparing items on Clean Juice's fall menu, which due to their impending rebrand, Defendants had no legitimate purpose for. (Dkts. 7 ¶ 40; 7-24). Thus, while preparing to open CraveWell Café, the franchisees not only had access to Clean Juice's most secret documents (like the Manual and training materials) through the password-protected resources portal (Dkt. 7 ¶ 21), but the franchisees were actively seeking out Clean Juice's confidential information.

CraveWell Café's concept is nearly identical to Clean Juice's. Of the nine principal menu categories on Clean Juice's menu, CraveWell Café offers all of them: smoothies, fresh juices, acai bowls, salads, sandwiches, wraps, toasts, cold press, wellness shots, and cleanses. (*Compare* Dkt. 7 ¶ 34, *and* Dkts. 7-20, 7-21, *with* Dkt. 7 ¶ 36, *and* Dkt. 6-8 at 8–24).[5] The Defendants have encouraged an association between their former Clean Juice restaurants and CraveWell Café. In social media posts, the Manchesters described their new CraveWell Café locations as: "Same people, same smiles, but a fresh look and exciting new flavors!" (Dkts. 6-9 to 6-11, at 3). Additionally, an employee at the Mt. Pleasant CraveWell Café told a guest that CraveWell Café was the same thing as Clean Juice and had the same owner, with the only difference being the name and offering more food items. (Dkt. 9-1 at 7). At least one customer has confused Clean Juice with CraveWell Café, having mentioned Clean Juice in a social media post that displays a CraveWell Café product. (Dkt. 7 ¶ 38; Dkt. 7-22).

### F.  Clean Juice terminates the franchise agreements, but the franchisees refuse to comply with their post-termination obligations.

By written notice, Clean Juice terminated the Philadelphia franchise agreements on October 17, 2023, due to the franchisees' abandonment of the franchised businesses, violation of the In-Term Covenants, and violation of a cross-default provision. (Dkts. 1-8 to 1-10). Clean Juice demanded that they stop using the System; return, delete, or destroy all confidential information; and comply with their post-termination obligations, including the Post-Term Covenants. (*Id.*). To date, the Philadelphia franchisees have not returned anything. And according to the www.cravewellcafe.com website and confirmed by a private investigator (Dkt. 10), the

---

[5]  The menus at each CraveWell Café location appear to be the same, except that the Wynnewood location does not serve sandwiches or salads "due to a landlord/tenant issue." (Dkt. 10 ¶ 21).

Manchesters are still operating the Collegeville, Malvern, and Wynnewood CraveWell Cafés.

Prior to closing, the Charleston franchisees stopped paying the mandatory royalty fees, brand fund contributions, and technology fees. (Compl. ¶ 60). Clean Juice gave the Charleston franchisees an opportunity to cure this default (Dkts. 1-11, 1-12), but they did not make the required payments (Compl. ¶ 62). Clean Juice therefore terminated the Charleston franchise agreements by written notice on December 6, 2023, citing these monetary defaults, the abandonment, violations of the In-Term Covenant, and violations of the cross-default provision. (Dkts. 1-13, 1-14). Just the same, the Charleston ex-franchisees did not return any confidential information, and they continue to own and operate the downtown Charleston and Mt. Pleasant CraveWell Cafés. (Dkt. 9).

### G.   Procedural History

On July 6, 2023, the Manchesters' entities demanded mediation to resolve several grievances they claimed to have with Clean Juice. The parties conducted the mediation on September 28, 2023 and declared an impasse on October 3, 2023. (Dkt. 6-16). On October 13, Clean Juice and the Philadelphia franchisees entered into Standstill Agreements. (Dkts. 6-12 to 6-14). They agreed that while the agreement was in place, neither would "institute litigation, arbitration, or any other legal proceeding" and that the "passage of time . . . shall not prejudice either party in any way." (*Id.* §§ 2, 5). Clean Juice terminated the Standstill agreement on December 19, 2023 (Dkt. 6-15) and filed this lawsuit three days later (Dkt. 1).

On August 15, 2023, Charleston Juicing, LLC demanded mediation with Clean Juice. The parties conducted a mediation on September 8, 2023 but reached an impasse. On September 27, 2023, Charleston Juicing, LLC filed a demand for arbitration against Clean Juice and several affiliated parties. An arbitrator has not yet been selected.

The parties' contracts require arbitration of "all claims or controversies arising out of or

related to" the franchise agreement. (Franchise Agreements § 25.4). However, all actions brought to "secur[e] injunctive relief" are exempted from the arbitration agreement. (*Id.*). The contract allows Clean Juice to bring any such action "in the federal district court covering the location of [Clean Juice's] principal place of business when the action is commenced." (*Id.* § 25.5). Clean Juice's principal place of business is Mecklenburg County, North Carolina (Dkt. 1 ¶ 3).

## ARGUMENT

Through this Motion, Clean Juice seeks a preliminary injunction against the franchisees and guarantors who are express parties to the franchise agreements and guaranties.[6] The Court should preliminarily enjoin these Defendants from (i) breaching the post-termination obligations, confidentiality provisions, and restrictive covenants in their franchise agreements and Guaranties; and (ii) misappropriating Clean Juice's trade secrets.

## I.     Clean Juice provided sufficient notice.

A party seeking a preliminary injunction must give notice to the opposing party. Fed. R. Civ. P. 65(a)(1). The notice requirement "implies a hearing in which the defendant is given a fair opportunity to oppose the application and to prepare for such opposition." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty.*, 415 U.S. 423, 433 (1974). Some courts require that the opposing party has been served with process. *See, e.g.*, *3M Co. v. Christian Investments LLC*, 1:11-CV-627, 2011 WL 3678144 (E.D. Va. Aug. 19, 2011).

Clean Juice has notified Defendants of this motion (Dkt. 6-5) and served Defendants with process (Dkt. 5). Thus, Clean Juice has satisfied Rule 65(a)'s notice requirements.

---

[6]    These parties are Charleston Juicing, LLC; CJ Collegeville, LLC; CJ Malvern, LLC; CJ Wynnewood, LLC; Roy O. Crain; Debra Manchester; and Morgan Manchester. An injunction against these parties will have the practical effect of stopping the other Defendants' misconduct.

**II.      Clean Juice satisfies the substantive legal standard for a preliminary injunction.**

The purpose of a preliminary injunction is to prevent irreparable harm during the pendency of a lawsuit. *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). The movant must show (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in its favor, and (4) the injunction is in the public interest. *Id.*

**A.      Clean Juice is likely to succeed on the merits.**

**1.      Defendants breached the franchise agreements and Guaranties.**

To prevail on its claim for breach of contract, Clean Juice must show "(1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000). The validity of the franchise agreements and Guaranties is self-evident because the parties performed under those agreements until 2023. Accordingly, the issue is whether Defendants breached those contracts, which they did.

> ***a.      Clean Juice properly terminated the franchise agreements, thus triggering the franchisees' and guarantors' post-termination obligations.***

Several of the franchisees' contractual obligations are triggered by termination of the franchise agreements. (Franchise Agreements §§ 11.3, 17.2, 17.8, 18.3). The same is true of the Guaranties, which make the guarantors individually liable for those same provisions. (*Id.* Attach. C, §§ 1.3, 2.1, 3.1). Here, Clean Juice is likely to succeed on the merits in establishing that it properly terminated the franchise agreements, thus triggering these provisions.

More specifically, any default listed in Section 16.2 allowed Clean Juice to terminate the franchise agreements "effective immediately upon the provision of notice." (*Id.* § 16.2). There were at least three such defaults.

First, each franchisee abandoned its Clean Juice restaurant. This allowed immediate termination under Section 16.2.1, which applies where the franchisee "cease[s] to operate, or

11

abandon[s], [its] Franchised Business for a period of seven consecutive days without receiving [Clean Juice's] prior express written consent . . . ." The franchisees cannot legitimately dispute their abandonment. They openly announced their intention to close (Dkts. 7-25, 7-29), are no longer operating Clean Juice restaurants at the Approved Locations (Dkts. 9, 10), and are instead operating CraveWell Cafés from those locations (*Id.*; *see also* Dkts. 6-6 to 6-11).

Second, Section 16.2.4 allowed immediate termination if the franchisee violated Section 18.2's In-Term Covenant. The evidence shows the Philadelphia franchisees opened CraveWell Café by at least October 2, 2023 (Dkts. 6-9 to 6-11, at 2), which was before their October 17, 2023 terminations (Dkts. 1-8 to 1-10). And the Charleston franchisees opened CraveWell Café by at least December 2, 2023 (Dkt. 9 ¶¶ 6–16), which was before their December 6, 2023 terminations (Dkts. 1-13, 1-14). It is elementary that these new restaurants "divert . . . business" from Clean Juice and therefore violate the In-Term Covenant. Customers can no longer order food and drink from Clean Juice, while Defendants' CraveWell Cafés are offering a nearly identical menu from the exact same locations.

Defendants cannot truthfully deny their involvement in CraveWell Café, so they may attempt to argue the In-Term Covenant is an unenforceable restraint on trade. That argument fails. The In-Term Covenant does not restrain trade because, by definition, the franchise agreements provide the franchisees with a way to earn a living during the term of the agreements. To Clean Juice's knowledge, no North Carolina state or federal court has scrutinized an in-term covenant in the same way courts typically scrutinize traditional noncompetition covenants.

To the contrary, courts recognize these in-term covenants are necessary to protect the franchisor's proprietary business methods. Courts routinely enforce these provisions even in the absence of geographic limitations. *See, e.g.*, *Deutchland Enterprises, Ltd. v. Burger King Corp.*,

957 F.2d 449, 453 (7th Cir. 1992) (affirming district court ruling enforcing in-term covenant with no geographical limitation); *Keating v. Baskin-Robbins USA Co.*, No. 5:99–CV–148–BR(3), 2001 WL 407017, at *13 (E.D.N.C. Mar. 27, 2001) (applying California law and finding it was "beyond cavil that an ice cream franchise may reasonably require a franchisee not to operate a competing ice cream store during the term of its franchise agreement").

Third, the cross-default provisions of § 16.2.15 provided an additional basis for termination. Under that provision, termination of a single franchise agreement results in the termination of all other franchise agreements with the same franchisee or affiliate.

Clean Juice complied with Section 16.2's notice requirement by giving written notice of termination to the Philadelphia franchisees on October 17, 2023 (Dkts. 1-8 to 1-10) and to the Charleston franchisees on December 6, 2023 (Dkts. 1-13, 1-14).

The Charleston franchisees' failure to pay royalties, advertising fees, and technology fees was a separate and independent basis for termination. (Compl. ¶ 60). Clean Juice gave proper notice of these monetary defaults and offered the contractually mandated five-day cure period. (Dkts. 1-1, 1-3 § 16.3; Dkts. 1-11, 1-12). The franchisee failed to cure (Compl. ¶ 62), which Clean Juice cited as an additional basis for termination (Dkts. 1-13, 1-14).

### b.    *Defendants breached their post-termination obligations.*

At a minimum, Defendants have breached Sections 11.3, 17.2, 17.8, and 18.3 of the franchise agreements.

By owning and operating CraveWell Cafés at their former Approved Locations, Defendants violated Section 18.3's Post-Term Covenant. Under North Carolina law, restrictive covenants in franchise agreements are valid and enforceable if they are "necessary to protect the legitimate interests of the franchisor" and "reasonable as to the duration and geographic scope." *Meineke Car Care Centers, LLC v. ASAR Inc.*, No. 3:14-CV-129-RJC, 2014 WL 3952491, at *5

(W.D.N.C. Aug. 13, 2014) (citation omitted). The reasonableness of a noncompetition covenant is a matter of law for the Court to decide. *Beasley v. Banks*, 90 N.C. App. 458, 368 S.E.2d 885, 886 (1988).

Courts have repeatedly held that franchisors like Clean Juice have a legitimate business interest in enforcing post-termination covenants. First, Clean Juice has an interest in stopping ex-franchisees from using its System to take away customers. *See Meineke Car Care Centers, Inc. v. Bica*, No. 3:11-CV-369-FDW-DCK, 2011 WL 4829420, at *4 (W.D.N.C. Oct. 12, 2011) ("If the Court allows Defendants to continue operating their store in violation of the covenant not to compete, Defendants will be able to use the confidential and proprietary information they acquired from Meineke to take business away from it."). For several years, the franchisees used the Clean Juice System to operate a juice bar. They cannot un-ring that bell and erase their built-up knowledge. It is unrealistic to believe that with no prior experience in the restaurant industry, they could have immediately launched a competing juice bar restaurant without using the proprietary business methods they learned from Clean Juice.

Second, Defendants are currently operating CraveWell Café out of the same Approved Locations where they previously operated their Clean Juice restaurants. This creates "a substantial likelihood of confusion among customers," which franchisors have a legitimate interest in stopping. *Baskin-Robbins Inc. v. Golde*, No. 5:99-CV-102-BR(3), 2000 WL 35536665, at *5 (E.D.N.C. May 26, 2000). Here, at least one customer has confused Clean Juice with CraveWell Café. (Dkt. 7-22).

Third, allowing an ex-franchisee to operate a competitive business in the same market, even under a different name, renders the franchisor "unable to reenter the market" and causes the franchisor to "lose the sales, goodwill and market presence it enjoyed." *Outdoor Lighting Persps.*

*Franchising, Inc. v. Home Amenities, Inc.*, No. 3:11-CV-0567-GCM, 2012 WL 137808, at \*2 (W.D.N.C. Jan. 18, 2012). This is particularly true where the ex-franchisee encourages an association between the companies. *Lockhart*, 2007 WL 2688551, at \*4. In *Lockhart*, the ex-franchisee encouraged that association by communicating its new restaurant had a "Different Name but still the BEST Beer Selection, Great Food and Awesome Staff." *Id.* at \*4 n.6. That is just what the Defendants have done in this case, characterizing their new restaurants as "Same people, same smiles, but a fresh look and exciting new flavors!" (Dkts. 6-9 to 6-11, at 3) and the "same thing as Clean Juice" (Dkt. 9-1, at 7).

Fourth, Clean Juice has an interest in "protecting the investments made by other [Clean Juice] franchisees." *Golde*, 2000 WL 35536665, at \*5. But for the Post-Term Covenant, Defendants would "unfairly achieve a significant competitive advantage" because they would be able to use the Clean Juice System "without having to pay," while other law-abiding franchisees continue to pay royalties. *Maaco Franchisor SPV, LLC v. Sadwick*, No. 3:20-CV-147, 2020 WL 2310730, at \*3 (W.D.N.C. May 8, 2020).

Fifth, Clean Juice has an interest in "preserving the integrity of its franchise system." *Home Amenities*, 2012 WL 137808, at \*3. "If its noncompete provisions are not enforced, the entire . . . franchise system is placed in jeopardy as franchisees may ignore their agreements and begin operating as a competing business knowing that the noncompete provisions may be disregarded and will and provide no protection to other franchisees." *Id.*; *see also Golde*, 2000 WL 35536665, at \*5 (recognizing a legitimate interest in "preventing break-away franchisees"). Here, this risk is especially high given that the Manchesters have publicized their attempt to exit the Clean Juice franchise system. (Dkts. 6-6, 6-7).

Having established a legitimate business interest, the court must evaluate the time and

territory elements in tandem, such that "a longer period of time is acceptable where the geographic restriction is relatively small, and vice versa." *Farr Assocs., Inc. v. Baskin*, 138 N.C. App. 276, 280, 530 S.E.2d 878, 881 (2000). Here, Clean Juice's two-year restriction is well within the outer limits that North Carolina courts have previously found enforceable. In *Lockhart*, this Court enforced a franchise agreement's two-year covenant after recognizing that North Carolina courts have previously upheld much longer covenants. 2007 WL 2688551, at *5 (citing *Keith v. Day*, 81 N.C. App. 185, 194, 343 S.E.2d 562, 568 (1986) (two years); *Jewel Box Stores Corp. v. Morrow*, 272 N.C. 659, 664, 158 S.E.2d 840, 843–44 (1968) (10 years); *Sineath v. Katzis*, 218 N.C. 740, 12 S.E.2d 671 (1940) (15 years)).

As to geography, the Post-Term Covenant includes three distinctly separable territories: (i) at the Approved Location, (ii) within ten miles of the Approved Location, or (iii) within ten miles of any Clean Juice Store open or under construction on the Effective Date of the franchise agreement. (Franchise Agreements § 18.3). Each of these is reasonable.

First, "at the Approved Location" is essentially a zero-mile radius and is unquestionably enforceable. *See Lockhart*, 2007 WL 2688551, at *1 (enforcing a franchise covenant that prohibited competition "at the restaurant site"). This alone is sufficient to establish a likelihood of success on the merits. Because the restriction is reasonable and Defendants are operating from the Approved Locations, Clean Juice does not have to rely on the broader 10-mile radiuses.[7]

Even so, a 10-mile radius is "well within the permissible range." *Id.* at *1 (*citing Keith*, 81 N.C. App. at 194–95, 343 S.E.2d at 568 (greater Raleigh area); *Robins & Weill, Inc. v. Mason*, 70

---

[7]     Even if the Court concluded the 10-mile radiuses in subsections (ii) and (iii) are unenforceable—which the Court should not do—that would not render subsection (i), "at the Approved Location," unenforceable. The Court could strike subsections (ii) and (iii) under North Carolina's blue pencil doctrine. *Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*, 368 N.C. 693, 696, 784 S.E.2d 457, 460 (2016).

N.C. App. 537, 539, 320 S.E.2d 693, 659 (1984) (two counties); *Forrest Paschall Mach. Co. v. Milhoen*, 27 N.C. App. 678, 687, 220 S.E.2d 190, 197 (1975) (350 miles)). Additionally, it is reasonable for this covenant to prohibit Defendants "from operating within a specified distance of [Clean Juice's] other franchisees." *Id.*, at *5 (citing *Manpower of Guilford Cnty., Inc. v. Hedgecock*, 42 N.C. App. 515, 523, 257 S.E.2d 109, 115 (1979)). To buttress the enforceability of the Post-Term Covenant, a rough geographical analysis shows the franchisees likely drew customers from beyond a 10-mile radius. (Dkt. 7 ¶¶ 28–31; Dkts. 7-15 to 7-19).

Having established the Post-Term Covenant is enforceable, there is little question Defendants are violating it, as each element of the covenant is satisfied. First, the ex-franchisees "own" and "operate" these competing restaurants. (Dkts. 6-6, 6-7, 9-1 at 7). CraveWell Café "offers the same or similar products" as Clean Juice, namely, smoothies, fresh juices, acai bowls, salads, sandwiches, wraps, toasts, cold press, wellness shots, and cleanses. (*Compare* Dkt. 7 ¶ 34, *and* Dkts. 7-20, 7-21, *with* Dkt. 7 ¶ 36, *and* Dkt. 6-8 at 8–24). Finally, the CraveWell Cafés are located at the ex-franchisees' Approved Locations. (*Compare* Dkt. 6-8, at 6–7, *with* Tables 1–2, *supra* at 2–3).

Defendants also breached their confidentiality obligations. As an initial matter, Sections 11.3 and 17.8 required the franchisees to return, delete, or destroy all copies of the Manual and other confidential information. They have not returned anything. Given that they sought out Clean Juice's confidential information just prior to launching CraveWell Café (Dkt. 7-23), there is no reason to believe Defendants deleted or destroyed anything.

Furthermore, Sections 11.3 required Defendants to use the Manual and Clean Juice's confidential information "only for [their] Franchised Business," and Section 17.2 required them to immediately stop using Clean Juice's proprietary methods upon termination. In assessing the

likelihood of success for this breach, the Court may consider circumstantial evidence. *See Carlson Env't Consultants, PC v. Slayton*, No. 3:17-CV-00149-FDW-DCK, 2017 WL 4225993, at *10 (W.D.N.C. Sept. 21, 2017) (enjoining further violations of confidentiality agreements upon finding "circumstantial evidence" of breaches). Here, the circumstantial evidence is overwhelming:

- Defendants were preparing to launch CraveWell Café while still operating their Clean Juice restaurants, as shown by their employee's use of an @cravewellcafe.com email address before the launch of the competing concept. (Dkt. 7-23).

- A week before the launch of the Pennsylvania CraveWell Café, one of Defendants' employees tried to access Clean Juice's food preparation guide for its Fall 2023 menu, even though both franchisees planned to rebrand during the Fall and therefore had no need to learn about the Fall menu. (*Id.*).

- Until a few weeks or days prior to launching CraveWell Café, Defendants had access to some of Clean Juice's most confidential materials, including the Manual, because their status as franchisees gave them password access to Clean Juice's resources portal. (Dkt. 7 ¶ 21).

- Defendants opened their CraveWell Café restaurants within days after closing their Clean Juice restaurants—a process that should have taken months or weeks had the Defendants created the concept from scratch rather than stealing it from Clean Juice.

- The CraveWell Café concept is highly similar to Clean Juice and offers all the same primary menu categories as Clean Juice. (*Compare* Dkt. 7 ¶ 34, *and* Dkts. 7-20, 7-21, *with* Dkt. 7 ¶ 36, *and* Dkt. 6-8 at 8–24).

- None of the Defendants have returned any confidential information or materials to Clean Juice.

If Defendants deny they used the Clean Juice System and proprietary methods to open and operate CraveWell Café, they would be asking the Court to ignore the obvious. Clean Juice has shown a strong likelihood of success on the merits on its claim for breach of the franchise agreements.

### c.     *The guarantors breached their Guaranties.*

Clean Juice has also shown a strong likelihood of success on the merits of its claim against

the individuals for breaching their Guaranties. In addition to guaranteeing the franchisee entities' "performance" under the franchise agreements (Franchise Agreements Attach. C, § 4.2), Crain and the Manchesters agreed to personally comply with the restrictive covenant and confidentiality provisions of the franchise agreements (*id.* §§ 1.3, 2.1, 3.1). These are critical protections for a franchisor. Otherwise, the owner could circumvent the post-termination obligations simply by organizing a new entity and hiding behind the corporate veil.

Here, Crain owns the Charleston CraveWell Café restaurants. (Dkt. 9-1 at 7). The Manchesters own and operate the Philadelphia restaurants. (Dkts. 6-6, 6-7, 6-9 to 6-11). As the sole owners of their franchisee entities (Franchise Agreements Attach. D), the guarantors cannot stick their heads in the sand and claim willful ignorance of their entities' violations. For this reason, courts frequently enter injunctions requiring guarantors to comply with post-termination obligations in franchise agreements. *See, e.g.*, *Lockhart*, 2007 WL 2688551, at *6.

### 2. Defendants misappropriated Clean Juice's trade secrets.

To prove a prima facie case of trade secret misappropriation under the North Carolina Trade Secrets Protection Act ("TSPA"), N.C. Gen. Stat. § 66-152, *et seq.*, or under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*, the plaintiff must show that (1) it possesses or holds a trade secret, and (2) the trade secret was misappropriated. *Amerigas Propane, L.P. v. Coffey*, No. 14-CVS-376, 2015 WL 6093207, at *12 (N.C. Super. Oct. 15, 2015) (TSPA elements); *Hunter Structural, P.A. v. Arp Eng., Inc.*, No. 3:17-CV-00086, 2018 WL 662367, at *5 (W.D.N.C. Feb. 1, 2018) (DTSA elements). Both statutes authorize courts to enjoin "actual or threatened misappropriation" of a trade secret. N.C. Gen. Stat. § 66–154(a); 18 U.S.C. § 1836(3)(A).

###### *a.* ***Clean Juice possesses trade secrets.***

A trade secret is "business or technical information" that "derives independent actual or potential commercial value from not being generally known" and is "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." N.C. Gen. Stat. § 66–152(3); 18 U.S.C. § 1839(3)(a). Here, Clean Juice's trade secrets include its Manual, the training materials housed on its resources portal, and the entire System as a whole.

These items are business or technical information. The Manual provides instruction for "all operational aspects" of operating a juice bar. (Dkt. 7-1, at 14, 18). The resources portal is a library of materials that franchisees can use for operational guidance. (Dkt. 7-7). And the System encompasses Clean Juice's proprietary business methods. (Franchise Agreements § 1.2). Each of these items derive independent value from not being known. Indeed, Clean Juice's franchisees— including these Defendants—pay initial franchise fees and ongoing royalties in exchange for these trade secrets. (Franchise Agreements §§ 5.1–5.3).

In the franchise context, operations manuals and training materials are quintessential trade secrets. *See, e.g.*, *Handel's Enterprises, Inc. v. Schulenburg*, 765 F. App'x 117, 123 (6th Cir. 2019) (affirming district court ruling that the franchisor's manual and "in-person training" constituted trade secrets); *Med. Search Consultants LLC v. Pasture Gate Holdings, Inc.*, No. 1:23-CV-00118-MR-WCM, 2023 WL 3396902, at *2 (W.D.N.C. May 10, 2023) (enjoining franchisee from misappropriating the franchisor's trade secrets "in the form of MSC's Recruiter Training Manual [and] Brand Standards Manual").

Courts also recognize that an entire system can constitute a trade secret. A particularly instructive case is *Quizno's Corp. v. Kampendahl*, No. 01-C-6433, 2002 WL 1012997 (N.D. Ill. May 20, 2002). In that case, the ex-franchisee argued "making a sandwich is too simple a notion to constitute a trade secret." *Id.* at *6. The court disagreed, finding the franchisee's description of the

Quizno's System was "excessively narrow." *Id.* The System entailed much more than making sandwiches; it included "recipes, menus, signs, and ovens initially approved as part of a Quizno's business strategy." *Id.* The same is true of the Clean Juice System. The value of the System is greater than the sum of its individual parts. It is more than just blending a smoothie. The Clean Juice System is a compilation of operational methods that, taken as a whole, constitutes a blueprint for operating a juice bar. *See also Dunkin' Donuts, Inc. v. Array Donuts, L.L.C.*, No. CV-05-387(JWB), 2005 WL 8176239, at *5 (D.N.J. Apr. 13, 2005) (enjoining the unauthorized use of the Dunkin' Donuts "System and Manual").

Clean Juice undertakes reasonable efforts to maintain the secrecy of these materials, including requiring franchisees to sign confidentiality agreements, requiring a password to access them, marking the Manual as confidential, and requiring the return of all confidential materials upon termination or expiration of the franchise agreement. *See Sunbelt Rentals, Inc. v. Head & Engquist Equip., LLC*, No. 00-CVS-10358, 2003 WL 21017456, at *28 (N.C. Super. Ct. May 2, 2003) (finding confidentiality provision and use of passwords are reasonable efforts to maintain secrecy).

### b. *Defendants misappropriated Clean Juice's trade secrets.*

"Misappropriation" is the "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent." N.C. Gen. Stat. § 66–152(1); *see also* 18 U.S.C. § 1839(5) (defining "misappropriation" similarly). A plaintiff establishes a prima facie case of misappropriation by showing the defendant: (1) knew or should have known of the trade secret; and (2) had a specific opportunity to acquire it for disclosure or use, or has acquired, disclosed, or used it without the plaintiff's consent or authority. N.C. Gen. Stat. § 66-155. Misappropriation may be proven through circumstantial evidence. *Med. Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 658, 670 S.E.2d 321, 329 (2009).

Defendants knew of the trade secrets because they signed the franchise agreement, which designated the Manual and System as confidential. (Franchise Agreements § 11.1). Defendants had a specific opportunity to acquire Clean Juice's trade secrets because their status as franchisees gave them password access to the resources portal, which housed these trade secrets.

The Court should not lose sight of the big picture. Within days of closing their Clean Juice restaurants, Defendants opened a new juice bar with a nearly identical menu. Successfully operating a juice bar requires more than just learning how to make a smoothie on a home blender. Among other things, the restaurant operator must order the correct ingredients, know how to prepare the food to scale, understand the correct portions, avoid food waste, and manage inventory. This is precisely what Clean Juice taught Defendants. It is not credible that Defendants could have created CraveWell Café from scratch—especially in such a short amount of time—without misappropriating this essential information from the Manual, training materials, and System.

**B. Clean Juice will suffer irreparable harm without an injunction.**

Defendants' conduct is likely to cause Clean Juice to suffer several forms of irreparable harm. First, Defendants' breaches of the Post-Term Covenant give them "an unfair competitive advantage over legitimate . . . franchisees in the area." *Meineke Car Care Centers, Inc. v. Quinones*, No. 3:06-CV-87-MU, 2006 WL 1549708, at *3 (W.D.N.C. June 1, 2006). Specifically, Defendants can now "offer their services for a lower price than the franchisees" because they are no longer paying royalty fees. *Id.* This will "draw customers away from" other Clean Juice franchisees, *Bica*, 2011 WL 4829420, at *5, and make it "difficult if not impossible for [Clean Juice] to re-establish an authorized, reputable . . . franchise in the same area," *Sadwick*, 2020 WL 2310730, at *3.

Second, allowing Defendants to breach the Post-Term Covenant "would undermine the value of all of the non-compete agreements" Clean Juice has with other franchisees, *Bica*, 2011

WL 4829420, at *5, because "other franchisees will be tempted to leave the franchise system after they have been afforded the opportunity to gain the benefit of the knowledge and training provided by the system," *Sadwick*, 2020 WL 2310730, at *3 (granting preliminary injunction). "This is made much more likely if franchisees believe they can do so with impunity, believing the courts will not hold them to their contractually agreed covenant not to compete." *Id.* The Manchesters' attempt to publicize their exit from the Clean Juice franchise system underscores the substantial likelihood of irreparable harm that will occur absent an injunction. (Dkts. 6-6, 6-7).

Third, Defendants' breaches create reputational harm. When a terminated franchisee operates a similar restaurant "in the exact locations," the franchisee "will reap the [franchisor's] goodwill" due to "the public's association" between the franchisor and that physical location. *Lockhart*, 2007 WL 2688551, at *4. An ex-franchisee can exacerbate this harm by encouraging an association between the new business and the franchisor. *Id.* In that situation, "an injunction is thus necessary, both to prevent the usurping of [the franchisor's] goodwill and to allow the public's association of the location . . . to dissipate." *Id.* Here, there is evidence of this harm having already occurred. Defendants have communicated to customers the similarities between Clean Juice and CraveWell Café (Dkts. 6-9 to 6-11, at 3; Dkt. 9-1 at 7), and there is at least one instance of actual customer confusion (Dkt. 7-22).

Fourth, North Carolina courts have consistently recognized "[t]he very nature of a trade secret mandates that misappropriation will have significant and continuous long-term effects" justifying an injunction. *Barr-Mullin, Inc. v. Browning*, 108 N.C. App. 590, 597, 424 S.E.2d 226, 230 (1993); *see also Duct-O-Wire Co. v. U.S. Crane, Inc.*, 31 F.3d 506, 509–10 (7th Cir. 1994) (affirming entry of a preliminary injunction and holding that the "irreparable harm is that [Franchisor] will lose sales and the opportunity to maintain and develop relationships with existing

and potential customers").

Clean Juice has shown that absent an injunction, it is likely to suffer irreparable harm.

**C.** **The balance of equities tips in Clean Juice's favor.**

In balancing the harms to both sides, "the real issue . . . is the degree of harm that will be suffered by the plaintiff or the defendant if the injunction is improperly granted or denied." *Lockhart*, 2007 WL 2688551, at *4. Given Defendants' open abandonment of their franchises and clear violations of the Post-Term Covenants, there is a low likelihood that any injunction will have been improperly granted.

The requested injunction would not create an unfair hardship on Defendants because they remain free to undertake a variety of activities that the Franchise Agreements do not prohibit. Rather than a juice bar, they could operate a pizza restaurant, a deli, or some other noncompeting concept. If they insist on operating a juice bar, they could do so outside the 10-mile radius so long as they do not use Clean Juice's proprietary methods. The "equities" should not favor the parties that rejected these permissible options and instead chose to violate their franchise agreements.

To the extent there is any hardship on Defendants, it is entirely self-inflicted and, therefore, not inequitable. *See Am. Dairy Queen Corp. v. YS & J Enters., Inc.*, No. 5:14-CV-151-BR, 2014 WL 1327017, at *4 (E.D.N.C. Apr. 2, 2014) (finding it "is not unjust to hold defendants to these mutually agreed upon obligations," and any harm to the defendants 'is largely self-inflicted"). The Charleston and Philadelphia franchisees abandoned their franchises with four and six years remaining on their franchise agreements, respectively. Clean Juice did not force them from the system and would have happily allowed them to remain as franchisees for the rest of their respective terms. Defendants chose to violate their contractual obligations. They cannot cry foul at the consequences of their own actions.

The balance of hardships weighs decidedly in Clean Juice's favor.

**D.    An injunction is in the public interest.**

The public interest favors the enforcement of mutually agreed-upon contractual obligations, including restrictive covenants. *Lockhart*, 2007 WL 2688551, at *6. Safeguarding trade secrets furthers the public interest by "encouraging research and development to provide consumers with competitive, quality products." *Merck & Co. Inc. v. Lyon*, 941 F. Supp. 1443, 1462 (M.D.N.C. 1996). Accordingly, this final factor favors entry of an injunction.

## <u>CONCLUSION</u>

For the foregoing reasons, Clean Juice respectfully requests that the Court enter an order granting Clean Juice's Motion for a Preliminary Injunction.