CLEAN JUICE FRANCHISING, LLC,

      Plaintiff,

v.

CHARLESTON JUICING, LLC,
CHARLESTON JUICING CALHOUN, LLC,
CHARLESTON JUICING WEST ASHLEY, LLC,
CHARLESTON JUICING MT. PLEASANT, LLC,
ROY O. CRAIN, CJ COLLEGEVILLE, LLC,
CJ MALVERN, LLC, CJ WYNNEWOOD, LLC,
VOGT GOODYEAR ENTERPRISES, LLC,
DEBRA K. MANCHESTER,
MORGAN K. MANCHESTER, and
RICHARD KLINE,

      Defendants.

_____/

## DEFENDANTS' SUR-REPLY IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCITON

Defendants CHARLESTON JUICING, LLC, CHARLESTON JUICING CALHOUN, LLC, CHARLESTON JUICING WEST ASHLEY, LLC, CHARLESTON JUICING MT. PLEASANT, LLC, ROY O. CRAIN, CJ COLLEGEVILLE, LLC, CJ MALVERN, LLC, CJ WYNNEWOOD, LLC, VOGT GOODYEAR ENTERPRISES, LLC, DEBRA K. MANCHESTER, MORGAN K. MANCHESTER, and RICHARD KLINE (collectively "Defendants"), by and through undersigned counsel and pursuant to this Court's April 26, 2024 Order, hereby file their *Sur-Reply in Opposition to Plaintiff's Motion for Preliminary Injunction* and, in support thereof, state as follows:

### PRELIMINARY STATEMENT

Clean Juice prohibited its franchisees from manufacturing in-house, fresh cold-pressed

juices and forced its franchisees to purchase High Pressure Processed ("HPP") juices directly from Clean Juice's affiliate, Clean Juice Distribution, LLC ("CJD"). It is undisputed that this change to HPP juices caused the average revenues for the entire Clean Juice franchise system to decline. As demonstrated by the profit and loss statements of Defendants' former Clean Juice franchises submitted herewith, as a result of the switch to HPP juices Defendants' former Clean Juice franchises suffered severe reductions in revenues and profitability.

Also, as described fully below, Clean Juice does not possess any alleged trade secrets. The alleged trade secrets submitted in connection with Clean Juice's Reply are generally known in the restaurant industry, were never provided to Defendants until after they were forced to learn how to operate themselves, and in many instances were actually provided by Defendants to Clean Juice.

I.   **Clean Juice's switch to HPP Juices was directly responsible for the severe reduction in sales and profitability of Defendants' Clean Juice franchises and was done in order to line Clean Juice's pockets**

This Court has confirmed that "relief to enforce the terms of a noncompete will not be granted to a party who has committed a breach that is substantial and material and goes to the heart of the agreement. This is so because North Carolina courts have long recognized that a party seeking equitable relief, such an injunctive relief, must come before the court with 'clean hands.'" *Maaco Franchisor SPV, LLC v. Kennevan, LLC et al.*, 2020 WL 5577889 *3 (W.D.N.C. 2020).

Clean Juice analogizes its decision to make the drastic change of eliminating from its franchise system fresh, cold-pressed juices made daily by the franchisees and forcing franchisees to purchase HPP juices directly from its affiliate to "McDonald's (bringing) back the McRib." *See* D.E. 32 at p. 3. A franchisor re-introducing a similar product, such as was the case with McDonald's and the McRib, does not compare in any way to Clean Juice's decision to switch to HPP Juices. Clean Juice eliminated the primary product and, indeed, the very concept of Clean

Juice, which was to offer a menu where every item is made fresh daily with a specialty in cold-pressed juices. The switch to HPP Juices, which are widely available, constituted a fundamental change to the business model and transformed the stores to an entirely different concept. Notably, as described in Defendants' Opposition [ECF No. 28] it is illegal to call HPP juices "fresh," the very term Clean Juice used to describe its franchise system, and **40%** of Defendants' sales consisted of the fresh, in-house cold-pressed juices manufactured daily by Defendants. *See* ECF No. 27 at ¶37[1]; ECF No. 28 at p. 9.

Clean Juice argues that Section 10.3.7 of the subject Franchise Agreements permit Clean Juice to make "modifications" to the franchise system. *See* ECF No. 32 at p. 16-17. Clean Juice fails to mention that Section 10.3.7 provides that clean Juice may only make such modifications "in response to changing market conditions." *See* ECF No. 1-2 at p. 27. This makes the subject Franchise Agreements distinguishable to the ones at issue in the cases cited by Clean Juice on page 15 and 16 of its Reply, pertaining to a franchisor's modifications to the franchise system. Not only has Clean Juice failed to identify any such changing market conditions, the market rejected the change to HPP Juices, as is demonstrated by the severe decline in revenues and profitability of Defendants' Clean Juice franchises, discussed below.

Further, Clean Juice was expressly required by Section 2.1 of the subject Franchise Agreements to provide to Defendants a "System" pertaining to "cold-pressed vegetable and fruit juices using a hydraulic press…All menu items are prepared fresh daily according to the System" *See* D.E. 28 at p. 8 (Paragraph 12 of the Statement of Facts) & p. 23-24. Thus, the cases cited by Clean Juice on page 15 and 16 of its Reply, regarding modifications to franchise systems, are irrelevant because any general discretion to make modification does not permit Clean Juice to

---

[1] Citations to page numbers are to the ECF generated page numbers and not to native pagination.

breach the express provisions requiring it to provide a System where all menu items are prepared daily, including cold-pressed juices made by a hydraulic press. *See In re Lionel Yow*, 590 B.R. 696, 705 (E.D.N.C. 2018) ("If a contract's provisions are conflicting, a court should apply specific provisions of a contract over more general provision dealing with the same subject matter.").

At a minimum, it was a breach of the covenant of good faith and dealing for Clean Juice to make such a drastic change to the franchise system at the expense of Defendants' revenues and profits. *See e.g. Stuller, Inc. v. Steak N Shake Enterprises, Inc*., 695 F.3d 676, 680 (7th Cir. 2012) (Injunction entered preventing franchisor from requiring franchisee to incorporate new pricing policies because the "policy would be a significant change to (the franchisee's) business model and…would negatively affect (the franchisee's) revenue.").

### A.     The Profit and Loss Statements

The relevant profit and loss statements of Defendants' former Clean Juice franchises are attached as Exhibits 1-5 to the Second Declaration of Richard Kline (the "Second Kline Decl."), ECF No. 58. The 3 Pennsylvania Clean Juice franchises began offering HPP juices in October of 2023. ECF No. 58 at ¶6. Accordingly, the 2022 and 2023 profit and loss statements for the Pennsylvania stores for January through September have been submitted for an "Apples to Apples" comparison. Likewise, the 2 South Carolina franchises at issue began offering HPP juices in November, 2023. *Id*. Accordingly, the 2022 and 2023 profit and loss statements of the South Carolina stores for January through October have been submitted.

The 2022 and 2023 profit and loss statements for the **Wynnewood, Pennsylvania** Clean Juice Store are attached to the Kline Decl. as Exhibit 1 and reveal the following. *Total Income*: **2022**: $563,563.42; **2023**: $455,260.00; *Net Income*: **2022**: $4,388.29; **2023**: (loss of $4,970.37, there is a negative sign before the dollar sign). *See* ECF No. 58-1.

The 2022 and 2023 profit and loss statements for the **Collegeville, Pennsylvania** Clean Juice Store are attached to the Kline Decl. as Exhibit 2 and reveal the following: _Total Income_ **2022**: $ 534,762.07; **2023**: $ 440,805.19; _Net Income_: **2022**: $20,619.52; **2023**: $14,692.27 _See_ ECF No. 58-2.

The 2022 and 2023 profit and loss statements for the **Malvern, Pennsylvania** Clean Juice store are attached to the Kline Decl. as Exhibit 3 and reveal the following: _Total Income_: **2022**: $359,417.03; **2023**: $292,275.67; _Net Income_: **2022**: (loss of $57,561.74, there is a negative sign in front of the dollar symbol); **2023**: (loss of $53,850.44, there is a negative sign in front of the dollar symbol). _See_ ECF No. 58-3.

The 2022 and 2023 profit and loss statements for the **Calhoun, South Carolina** Clean Juice store are attached to the Kline Decl. as Exhibit 4 and reveal the following: _Total Income:_ **2022**: $593,167.71; **2023**: $487,896.82; _Net Income_: **2022**: $45,466.52; **2023**: $15,019.76 _See_ ECF No. 58-4.

The 2022 and 2023 profit and loss statements for the **Mount Pleasant, South Carolina** Clean Juice store are attached to the Kline Decl. as Exhibit 5 and reveal the following: _Total Income_: **2022**: $514,860.52; **2023**: $442,546.40; _Net Income:_ **2022**: $15,559.55; **2023 Reported**: $37,481.04; **2023 Actual:** While a profit of $37,481.04 was reported, this number is incorrect. Clean was responsible for the bookkeeping for the Mt. Pleasant store during this time period. _See_ Second Kline Decl. at ¶14. Clean Juice failed to include on Mr. Pleasant's 2023 profit and loss statement numerous rent payments. _Id_. From January, 2023 through October, 2023, Mt. Pleasant paid $54,623.30 in rent, but the 2023 profit and loss statement only shows about $16,386.99 in rent. _Id_. When the correct 2023 rent is accounted for, the Mt. Pleasant franchise incurred a loss of $755.27 for the period from January through October, 2023. _Id_.

As set forth above, the sales of all Defendants' former Clean Juice franchises significantly decreased. This is consistent with the undisputed fact that the average revenues for the entire Clean Juice franchise system decreased following the switch to HPP. *See* D.E. 28 at p. 10 (Paragraph 19 of the Statement of Facts). The profitability of all of Defendants' former Clean Juice franchises also significantly decreased, with the one exception being that the Malvern store lost a little less money. This one negligible improvement, if losing tens of thousands of dollars can be called an improvement, was the result of management changes that the franchisee implemented to reduce costs, as opposed to the switch to HPP juices. *See* Second Kline Decl. at ¶18.

Of course, any reduction in costs did not make up for the loss of revenues and profitability, as demonstrated by the profit and loss statements. Also, any reduction in labor was attributable to the decline in revenues caused by the HPP juices, which forced the franchisees to spend less on labor, as well as Defendants' implementation of strict cost controls. *Id*. at ¶¶16 & 18. Further, it is industry standard to measure costs as a percentage of sales. *Id*. at ¶13. The labor costs as a percentage of sales only marginally decreased. Notably, it was more expensive for the franchises to purchase the HPP juices from Clean Juice's affiliate, CJD, than it was for the franchisees to purchase the items required to manufacture in-house cold-pressed juices. *Id*. at ¶17. Consequently, the cost of goods as well as the variable costs (consisting of labor and cost of goods and excluding fixed costs such as rent) actually increased as a percentage of sales for the 2 South Carolina Clean Juice franchises.[2]

---

[2] The cost of goods ("cogs") as a percentage of sales for the Calhoun location for 2022 and 2023 was 29.9% ($177,712.70 in cogs divided by $593,167.71 in sales) and 34% ($165,969.21 in cogs divided by $487,896.82 in sales), respectively. See ECF No. 58-4. The total variable cost (labor and cost of goods) as a percentage of sales for the Calhoun location for 2022 and 2023 were 55.3% (the cogs plus labor of $150,862.18 divided by the sales) and 58.6% (the cogs plus labor of $120,021.31 divided by the sales), respectively. *Id*. The cost of goods as a percentage of sales for the Mt. Pleasant location for 2022 and 2023 was 28.92% ($148,913.25 in cogs divided by

**B.    The Franchisee Counsil relied on Clean Juice's false representations that the switch would improve sales and profits**

Clean Juice states that, "Clean Juice's franchisee council unanimously recommend adopting [the change to HPP juices]." D.E. 32 at p. 16. Clean Juice also attaches as Exhibits 11-13 certain PowerPoint Presentations which Clean Juice created in an attempt to convince the franchisee council to agree to the change to HPP juices. *See* D.E. 33-11, 33-12, 33-13. To the extent the franchise council (which only consisted of about 5 franchisees) agreed to the switch to HPP, it only did so on its reliance on Clean Juice's false representations. Indeed, the presentations falsely represented that the switch to HPP would result in a significant increase in sales and profitability as well as a decrease in costs. *See* D.E. 33-11, pg. 9 ("Improve Franchise Store Profits…Improve Sales and Reduce Structural Costs to Enable Higher Profits"). As described above, the opposite actually happened. Sales and profitability decreased and costs increased.

In addition, Clean Juice's PowerPoint states that 17-20% more cold-pressed products would be sold. *See* D.E. 33-11 at p. 4. In reality, the sale of cold-pressed products were significantly reduced. For example, from January 1, 2022 through March 31, 2022, before the switch to HPP, sales of cold-pressed juices for Defendants' former Clean Juice franchises amounted to $169,937.07. *See* Second Kline Decl. at ¶19. From January 1, 2023 through March 31, 2023, cold-pressed sales amounted to $137,051.69. *Id*. Thus, there was a reduction of cold-pressed sales of 19.4% for the first quarter of 2023. It was abundantly clear that the customers of Defendants' former Clean Juice franchises were highly dissatisfied with the HPP juices. *Id*.

---

$514,860.52 in sales) and 35.1% ($155,335.78 in cogs divided by $442,546.40 in sales), respectively. See ECF 58-5. The total variable cost (labor and cost of goods) as a percentage of sales for the Mt. Pleasant location for 2022 and 2023 were 58.62% (the cogs plus labor of $152,942.22 divided by the sales) and 62.53% (the cogs plus labor of $121,397.54 divided by the sales), respectively. *Id.*

In an apparent attempt to demonstrate that some unknown number of Clean Juice stores experienced an increase in revenues, the Second Declaration of Landon Eckles ("Second Eckles Decl.") (ECF No. 33) purports to attach as Exhibit 14 the financial performance of "several stores" following the switch to HPP juices. *See* ECF No. 33 at ¶29. Exhibit 14 is blank and does not contain any information. *See* ECF No. 33-14.

Clean Juice also asserts that the lifespan of the hydraulic press is just 5 years. ECF No. 32 at p. 15. As reflected by correspondence from the Good Nature, the company that manufactures the hydraulic presses that were used, the lifespan is well more than 5 years, with models from the 1990s still operational. See the correspondence, ECF No. 59-1, attached as Exhibit 1 to the Second Declaration of Deb Manchester (the Second Manchester Decl."), ECF No. 59. It is unreasonable to suggest that a machine costing $50,000 to install would have a lifespan of just 5 years.

**C.     The switch to HPP was done to line the pockets of Clean Juice's affiliate, Clean Juice Distribution, LLC**

In Paragraph 33 of the Second Eckles Decl. Clean Juice admits that it obtains, through its affiliate CJD, a kickback on franchisees' purchases of its HPP juices equating to "one-fifth of what franchisees earn." *See* ECF No. 33 at ¶33. Notably, this kickback to CJD is in addition to the monies that go to Youngstown Distributors and Sysco, all of which serve to artificially inflate the cost of Clean Juice's HPP juices to its franchisees. *Id.* The kickbacks to Clean Juice explains why the costs to Clean Juice franchisees of Clean Juice's HPP juices is almost double the cost of readily available superior HPP juices. *See* ECF No. 27 at ¶42.

Clean Juice does not dispute that CJD earned $1,172,279 within a short period at the end of 2022, as disclosed in Clean Juice's FDD. *See* ECF No. 28 at p. 11. In its Reply, Clean Juice asserts that it operated at a loss in 2022 based solely on CJD's 2022 profit and loss statement filed as ECF No. 33-20. This profit and loss statement is illegible. Assuming *arguendo* that CJD did

operate at a loss in 2022, it is misleading to focus on 2022 losses because Clean Juice did not force its franchisees to purchase its HPP juices _until October, 2022_, and the HPP program was not even fully rolled out until the _end of 2022_. *See* Second Kline Decl. at ¶5. Thus, CJD's 2022 revenue would have been a fraction of its revenues in subsequent years.

## II.     Clean Juice does not possess any trade secrets

Clean Juice continues to fail to identify its trade secrets with sufficient particularity or prove that its alleged trade secrets constitute information that is not generally known or readily ascertainable, both of which are Clean Juice's burden under the law. *See* ECF No. 28 at p. 16-21. Instead, Clean Juice persists in identifying only broad categories such as "The Manual," which as discussed in the Opposition does not contain any information that is not generally known, similar to other franchise operations manuals which Courts have found to not contain trade secrets. *Id*; Reply, ECF No. 32 at p. 6. Clean Juice's insistence that its trade secret "is the entire Clean Juice franchise system" highlights that Clean Juice is simply unable to identify and prove that any particular, alleged trade secret is not readily ascertainable. *Id*. Significantly, it is Clean Juice's burden to "separate the [alleged trade secrets] from matters of general knowledge in the trade." *Silicon Knights Inc. v. Epic Games, Inc*. 2008 WL 2414046 *8 (W.D.N.C. 2008). Clean Juice has failed to do so in a single instance.

Clean Juice's contends that Defendants' assertions that its alleged trade secrets are generally known are "conclusory." ECF No. 32 at p. 9. Clean Juice is incorrect. Defendants have submitted the Declarations of Richard Kline, who has extensive restaurant industry experience that was gained prior to his time working at a Clean Juice restaurant. *See* ECF No. 27 at ¶¶2-9.  As such, Mr. Kline is in a position to comment on whether Clean Juice's information and documents are generally known, and Mr. Kline has detailed how the information and documents submitted by

Clean Juice is generally known. Clean Juice's general assertions that its information somehow constitutes trade secrets are conclusory given that Clean Juice has failed to explain how any particular alleged trade secret or business method is unique to Clean Juice.

In connection with its Reply, Clean Juice submitted Exhibits 1 – 9 of the Second Eckles Decl. as documents which Clean Juice contends constitutes its alleged trade secrets. As described below, none of these new documents contain any trade secrets and Clean Juice fails to separate the matters of general knowledge in accordance with *Epic Games*.

Further, Defendants began operating their Clean Juice restaurants in 2017 and 2019. *See* ECF No. 1 at ¶¶36 & 42. As described below, Clean Juice only provided to Defendants many of the new documents attached to the Second Eckles Decl. in 2023. By the time Clean Juice provided the documents, Defendants had already been forced to teach themselves how to operate, and Defendants also recognized that the documents were ineffective tools. Consequently, Defendants never utilized the documents. Thus, even assuming *arguendo* that the documents contain trade secrets (although they do not), Clean Juice is not likely to prevail on its claims that Defendants misappropriated any alleged trade secrets. *See DSM Dyneema, LLC v. Thagard*, 2019 WL 3228346 *8 (N.C. Superior Court 2019) ("Once a plaintiff has demonstrated that it has a trade secret, it must also present substantial evidence of misappropriation."). Notably, as detailed below, many of the alleged trade secrets contained in the new documents were provided by Defendants to Clean Juice, not the other way around. The new documents are discussed below:

1)      The "New Store Opening Marketing Guide" [ECF 33-1] does not contain anything other than information that is readily ascertainable and generally known in the restaurant industry. *See* Second Kline Decl. at ¶20. For example, its states that franchisees "smile." ECF 33-1 at p. 2. Clean Juice fails to separate the matters of general knowledge in accordance with *Epic Games*.

2)      Similarly, the "Grand Openings Must Haves" [ECF No. 33-2] does not contain anything other than information that is generally known in the restaurant industry. See Second Kline Decl. at ¶21. For example, the document suggests that franchisees draw attention to their store with balloons. *See* ECF No. 33-2 at p. 2. Not only is the utilization of balloons common knowledge, this idea – as well as the very image of the balloons contained in ECF No. 33 – was provided to Clean Juice by Defendant Deb Manchester. *See* ECF Nos. 59-2 & 59-3 (Email and attachment where Ms. Manchester send the balloon idea to Clean Juice and attaches the pictures of the balloons ultimately included by Clean Juice in ECF No. 33-2.

3)      The PAR calculator [ECF No. 33-3], which is supposed to be utilized to calculate amounts of items to purchase ("Par levels"), was only provided to franchisees in January, 2023. By this time, the Clean Juice Franchises had already been forced to develop their own systems to calculated Par levels because Clean Juice had not provided any such guidance. *See* Second Kline Decl. at ¶22. Moreover, the Par calculator is an ineffective tool because it does not account for seasonality changes or distinguish between periods of time that are known to be higher grossing and because it does not take into account the trends of the sales of the previous months. *Id*. Consequently, the Par calculator was not useful and was not utilized by Defendants.

4)      The Waste Guide [ECF No. 33-4] was not available until March, 2023. *See* Second Kline Decl. at ¶23. Again, by this time the Clean Juice Franchisees had already been forced to develop their own systems for managing waste. Thus, Defendants did not utilize the Waste Guide. The waste guides originally provided by Clean Juice were nothing more than blank tables and are attached as Exhibit 6 to the Kline Decl. ECF No. 58-6. Further, the Waste, ECF No. 33-4, does not contain any information that is not generally known. *See* Second Kline Decl. at ¶23. For example, the Waste Guide provides that cucumbers should be refrigerated, which is generally known. *Id*.

5)      The Master COGs worksheet [ECF No. 33-5], which is supposed to be utilized to calculate ingredient costs, was not made available to franchisees until August, 2023. Again, by this time Defendants had already been forced to develop their own methods for determining ingredient costs. Further, the Master COGs worksheet was only created after Mr. Kline informed Clean Juice representatives, including Landon and Katherine Eckles, in February, 2023 how Clean Juice's then-current Master COGs sheet was ineffective. *See* Second Kline Decl. at ¶24.

6)      The Prep Guide. [ECF No. 33-6] is a standard prep guide that any restaurant would utilize. *Id*. at ¶25. It does not contain anything other than information that is generally known. *Id*. For example, the first portion of the Prep Guide is dedicated to instructions on how to clean a sink.

7)      The Juicerista Trainee Guide [ECF No 33-7] does not contain anything other than information that is generally known. *Id*. at ¶26. It is simply a checklist containing items such as "Wearing Gloves" and "Washing Hands."

8)      The "Local Store Marketing Playbook" [ECF No. 33-8] does not contain anything other than information that is generally known. *Id*. at ¶27.  For example, it suggests that franchisees join their local chambers of commerce. *See* ECF No. 33-8 at p. 19. This is a common practice. Further, this document primarily focuses on business to business marketing, which is generally not useful in the restaurant industry. Second Kline Decl. at ¶27.

9)      Likewise, the "Centralized Booster Program" [ECF No. 33-9] does not contain any trade secrets. *Id*. at ¶28. This short document appears to simply suggest that franchisees attempt to partner with influencers, a common practice across many industries.

## III.     Under Clean Juice's interpretation of the noncompetes, they are too broad and unenforceable

Defendants explained how the subject noncompetes prohibit Defendants from operating "any store serving as its primary menu offering freshly made to order fruit, vegetable juices, and

smoothies." *See* ECF No. 28 at p. 15. In its Reply, Clean Juice maintains that the subject noncompetes prohibit Defendants from operating any business which "offers the same or similar products or services" as Clean Juice. *See* ECF No. 32 at p. 12. Assuming *arguendo* that Clean Juice is correct, then the noncompetes are unenforceable under North Carolina law. For example, in *RLM Communications, Inc. v. Tuschen*, 831 F.3d 190 (4th Cir. 2016) the Fourth District Court of Appeal held that a noncompete was overly broad and unenforceable under North Carolina law where it prohibited the employee from indirect participation in any "business that is similar" to the employer. *Tuschen*, 831 F.3d 190, 196-197 (4th Cir. 2016). Likewise, the subject noncompetes prohibit Defendants from "indirectly" participating in any business that "offers the same or similar products" to Clean Juice. *See e.g.* ECF No. 1-2 at §18.3. Notably, the Court in *Tuschen* explained that, under North Carolina law, the Court was not permitted to "blue pencil" or rewrite the noncompete to make it enforceable. *Tuschen*, 831 F.3d 190, 196-197 (4th Cir. 2016).

## IV. Clean Juice is not suffering irreparable harm

Clean Juice's argument that its nonenforcement of its noncompetes with other franchisees are irrelevant is erroneous. *See* Reply at p. 18-20. Clean Juice has made the enforcement of its noncompetes a key issue by arguing that it requires injunctive relief to deter other potential "break-away franchisees." *See* ECF No. 11 at p. 21. In *Baskin-Robbins, Inc. v. Patel*, 264 F.Supp.2d 607 (N.D. Ill. 2003), the Baskin-Robbins franchisor made the same argument and the Northern District of Illinois found that:

> the apparent history of plaintiffs permitting others, or even the former franchisee, to operate in former Baskin–Robbins locations, undermines plaintiffs' contention that they need relief here to send a message to potential breakaway franchisees. In short, we need more information—information through the medium of an evidentiary hearing—before we can comfortably assess the relative, and irreparable, nature of the harm.

*Id*. at 612.

Notably, the Courts in *Kempner*, *Eye Technology* and *Midwest Television*, referenced in the below footnote, held that noncomptes may be waived by selective enforcement.[3] Also, assuming *arguendo* that Clean Juice has not waived its right to sue for breach of the noncompetes (although it has) Clean Juice may seek the remedy of damages (although Defendants contend that Plaintiff cannot recover such damages)[4] but Clean Juice may not obtain the extraordinary remedy of a preliminary injunction because it has not suffered ***irreparable harm***. It is well-established that a franchisor's delay of enforcing a noncompete demonstrates that the franchisor is not suffering irreparable harm. *See General Partes Distribution, LLC v. Perry*, 907 F.Supp.2d 690, 692 (E.D.N.C. 2012). Likewise, Clean Juice's system-wide abandonment of its noncompetes with its franchisees undercuts any claim of irreparable harm here.

Significantly, only two of the cases cited by Clean Juice in its Reply dealt with restrictive covenants, *HR Staffing Consultants, LLC v. Butts*, No. CIV. 2:15-3155, 2015 WL 3492609, at *11 (D.N.J. June 2, 2015) and *ADP, LLC v. Rafferty*, 923 F.3d 113, 123 (3d Cir. 2019). These cases stand for the proposition that a noncompete may be waived by an employer via selective enforcement if the employer does not have a legitimate basis for the selective enforcement. For

---

[3] A plaintiff's failure to enforce its noncompetition agreements with non-parties may be considered a waiver of the plaintiff's noncompete with the defendant where the plaintiff's "actions in failing to enforce the non-compete provisions amount to a complete disregard for those provisions." *Kempner Mobile Electronics, Inc. v. Southwestern Bell Mobile Systems, LLC*, 2003 WL 1057929 *26 (N.D. Ill. 2003). *See e.g. Surgidev Corp. v. Eye Technology, Inc.*, 648 F.Supp. 661, 698 (D. Minn. 1986) (Court held that employer had waived its right to enforce non-compete provision after it "blithely ignored" provision with prior employees); *Midwest Television, Inc. v. Oloffson*, 699 N.E.2d 230, 237 (Ill. App. 3d. 1999) (Adopting *Surgidev* waiver standard and holding that a question of fact existed as to whether employer waived non-compete provision by selective enforcement).

[4] To be clear, Defendants contend that they have not breached the noncompetes, that Plaintiff may not enforce the noncompetes, and Plaintiff has not suffered and may not recover any damages for Defendants' alleged breach of the noncompetes.

example, in *Butts* the District of New Jersey found that there was no waiver because it was reasonable for the employer to exercise a degree of selectivity due to the "trouble and expense of enforcing the non-compete." *Butts*, 2015 WL 3492609, at *11 (D.N.J. 2015). In *Rafferty*, the Third Circuit stated that there is no "bright line rule" that restrictive covenants are unenforceable if enforced selectively and explained that it was reasonable for the plaintiff to selectively enforce its noncompetes depending on whether the employee was "high-performing." *Rafferty*, 923 F.3d 113, 123 (3d Cir. 2019). Here, Plaintiff has simply abandoned its noncompetes and does not have any legitimate reason for failing to enforce them.

Defendants also note that the anti-waiver provision in the Franchise Agreements, emphasized by Plaintiff in its Reply, was itself waived. *See Ada Liss Group, Ltd. v. Sara Lee Corp.*, 2013 WL 4735387 *19 (M.D.N.C. 2013) ("Generally, anti-waiver clauses can be waived."); Reply at p. 19-20.

Finally, the new alleged instances of customer confusion submitted by Clean Juice, ECF No. 33-21, based on an alleged email written to Clean Juice, does not establish a likelihood of irreparable harm. Notably, the email reflects that the customer is well aware that Defendants' Cravewell Café is not associated with Clean Juice as it states that the former Clean Juice location "closed down" and acknowledges that the Cravewell Café is different than Clean Juice. Also, clean Juice's assertion that Mr. Eckles may authenticate an Instagram post made by an unknown person by simply looking at it on is phone is erroneous, unsupported by any authority and contrary to established law. *See MGA Entertainment, Inc. v. Harris*, 2022 WL 4596697 *4-5 (C.D. Ca. 2022).

As such, for the foregoing reasons, this Court should deny Clean Juice's Motion for Preliminary Injunction.

Dated: May 3, 2024                     Respectfully submitted,

**HIRZEL DREYFUSS & DEMPSEY, PLLC**
*Counsel to Defendants*
1200 Anastasia Ave., Suite 240
Coral Gables, FL 33134
Telephone: (305) 615-1617

By: /s/ *Andre Dreyfuss*
     **LEON F. HIRZEL**
     Florida Bar No. 085966
     hirzel@hddlawfirm.com
     **ANDRE L. DREYFUSS**
     Florida Bar No. 0094868
     dreyfuss@hddlawfirm.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the foregoing document was filed on May 3, 2024 via CM/ECF, which will generate Notices of Electronic Filing to all counsel of record.

By: /s/*Andre Dreyfuss*
**ANDRE DREYFUSS**